No. 22-50458

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

JOE HOLCOMBE, Individually, as Heirs at Law and as Representatives of the Estate of John Bryan Holcombe, Deceased; CLARYCE HOLCOMBE, Individually, as Heirs at Law and as Representatives of the Estate of John Bryan Holcombe, Deceased,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

---

MARGARETTE VIDAL; MONICA SHABBIR; ROBERT VIDAL; RAMIRO VIDAL, JR.,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

---

CHARLENE UHL, Individually, as Heir at Law and as Representative of the Estate of Haley Krueger, Deceased,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

---

GARY RAMSEY, Individually and as Independent Co-Administrator of the Estate of Therese Jo Ann Rodriguez, Deceased; RONALD RAMSEY, JR., Individually and as Independent Co-Administrator of the Estate of Therese Jo Ann Rodriguez, Deceased,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

LISA McNULTY, Individually and as personal representative of the Estate of Tara McNulty, and as legal guardian of H.M. and J.M., two minor children,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

KATI WALL, Individually and as Personal Representative of the Estate of Dennis Johnson and the Estate of Sara Johnson; MICHAEL JOHNSON, Individually and as Personal Representative of the Estate of Dennis Johnson and the Estate of Sara Johnson; DENNIS NEIL JOHNSON, JR.; CHRISTOPHER JOHNSON; DEANNA STATON; JAMES GRAHAM,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

REGINA AMADOR, Individually and As Independent Administratrix of the Estate of Richard C. Rodriguez, Deceased, a/k/a Ricardo Rodriguez; JOSE RODRIGUEZ; GUADALUPE RODRIGUEZ,

Plaintiffs-Appellees/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

FARIDA BROWN,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

CHRISTOPHER WARD, Individually Representative of the Estates of Joann Ward, Deceased, and B.W. Deceased Minor, and as Next of Friend R.W., a Minor,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

KRIS WORKMAN,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

DAVID COLBATH,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

———————————

DEBORAH BRADEN, Individually and as Independent Executor of the Estate of Keith Allen Braden; ELIZABETH BRADEN, Individually and as A/N/F of Z.Z., a Minor; BENJAMIN CORRIGAN, Individually and as Independent Executor of the Estate of Robert Michael Corrigan and Shani Corrigan; PRESTON CORRIGAN; KARA BOYD (MARSHALL); MARTINA PACHAL, Individually and as Independent Administratrix of the Estate of Robert Scott Marshall and as Independent Executrix of the Estate of Karen Sue Marshall; ZACHARY POSTON; JIMMY STEVENS, Independent Executor of the Estate of Peggy Lynn Stevens Warden; JENNIFER RACEY (WARDEN); PATSY McCAIN,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

KYLE WORKMAN; MORGAN HARRIS,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

DALIA LOOKINGBILL, Individually and as Guardian of the Person and Estate of R.T., a minor, and as Representative of the Estate of E.G. deceased minor,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

ROSANNE SOLIS; JOAQUIN RAMIREZ,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

MARGARET MCKENZIE,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

FRED CURNOW; KATHLEEN CURNOW,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

JUAN MACIAS; JENNIFER MACIAS,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

KIP WORKMAN; JULIE WORKMAN,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

CHANCIE McMAHAN, Individually and as Next Friend of R.W., a Minor; SCOTT HOLCOMBE,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

DAVID EUGENE COLBATH, As Next of Friend of O.C.,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

KRIS WORKMAN, As Next of Friend of E.W.; COLBEY WORKMAN, As Next of
Friend of E.W.,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

JOHN PORTER HOLCOMBE, II, Individually, and as Independent Administrator
of the Estate of Crystal Holcombe, and as Wrongful Death Beneficiary of Crystal
Holcombe, John Bryan Holcombe, Karla Holcombe, and C.B.H., a Minor,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

COLBEY WORKMAN,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

————————————

ROBERT BRADEN; REBECCA METCALF; BRENDA MOULTON,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

JOHN PORTER HOLCOMBE, II, As Next Friend of Minors E.J.H. and P.J.H., and as Independent Administrator of the Estates of Minors G.L.H., E.R.H. and M.G.H.,

Plaintiff-Appellee/Cross-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

JESSICA MOULTON; WILLIAM LANE,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant/Cross-Appellee.

On Appeal from the United States District Court
for the Western District of Texas

**BRIEF FOR APPELLANT**

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JAIME ESPARZA
*United States Attorney*

MARK B. STERN
JOSHUA M. SALZMAN
McKAYE L. NEUMEISTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7258*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4747*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendant-appellant/ cross-appellee is a governmental party. 5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests oral argument in this case. The district court entered judgments totaling over $230 million against the United States in these tort actions. The record in this case is voluminous and the legal issues are important and complex. Oral argument will be of substantial benefit to this Court in understanding the important issues in the case.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ........................................................4

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE .................................................................4

    A.    Statutory and Regulatory Background ...........................................4

        1.    The Federal Tort Claims Act.............................................4

        2.    The Brady Act and the National Instant Criminal
              Background Check System ..................................................5

    B.    Factual Background ......................................................................7

    C.    Prior Proceedings........................................................................11

SUMMARY OF ARGUMENT.................................................................16

STANDARD OF REVIEW ......................................................................18

ARGUMENT ..........................................................................................19

I.    The United States Did Not Breach An Actionable Duty Arising From A
    Negligent Undertaking Or Proximately Cause Plaintiffs' Injuries .....................20

    A.    Plaintiffs failed to establish the predicates for negligent-
        undertaking liability.....................................................................20

    B.    The United States' conduct did not proximately cause plaintiffs'
        injuries.......................................................................................31

        1.    Causation based on Kelley's ability to purchase the firearm........31

        2.    Causation under the emboldenment theory....................................39

C.    Because there was no proper basis for negligent-undertaking liability, the negligent-supervision claims must be set aside as well ........ 41

II.    The Brady Act Precludes The Imposition Of Liability ........................................ 41

III.    The District Court Erred In Apportioning Liability ........................................... 46

A.    The district court erred in allocating liability to the United States under two mutually exclusive theories ........................................................... 47

B.    The United States was not more responsible for the attack than Kelley ........................................................................................................ 50

CONCLUSION ................................................................................................................. 53

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <u>**Page(s)**</u>

*Aguirre v. United States,*
  44 F. App'x 156 (9th Cir. 2002) ........................................................26

*Ambrosio v. Carter's Shooting Ctr., Inc.,*
  20 S.W.3d 262 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ..........32, 34, 35

*American Honda Motor Co. v. Milburn,*
  No. 05-19-000850-CV, 2021 WL 5504887
  (Tex. App.—Dallas Nov. 24, 2021, pet. filed) ................................48

*Askanase v. Fatjo,*
  130 F.3d 657 (5th Cir. 1997) ............................................................32

*Ayala v. United States,*
  49 F.3d 607 (10th Cir. 1995) ............................................................27

*Bell v. Campbell,*
  434 S.W.2d 117 (Tex. 1968) ............................................................38

*Boatman v. City of Garland,*
  No. 05-13-01232-CV, 2014 WL 2628193
  (Tex. App.—Dallas June 12, 2014, no pet.) ....................................34

*Bostic v. Georgia-Pac. Corp.,*
  439 S.W.3d 332 (Tex. 2014) ............................................................31

*Bush v. Texas Dep't of Protective & Regulatory Servs.,*
  983 S.W.2d 366 (Tex. App.—Fort Worth 1998, pet. denied) .....................................34

*Café Moda v. Palma,*
  272 P.3d 137 (Nev. 2012) ................................................................52

*Canipe v. National Loss Control Serv. Corp.,*
  736 F.2d 1055 (5th Cir. 1984) ..........................................................25

*Castillo v. Gared, Inc.,*
  1 S.W.3d 781 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ............................34

*Cherry v. Texas Dep't of Crim. Justice,*
    978 S.W.2d 240 (Tex. App.—Texarkana 1998, no pet.) ........................................ 33, 34

*City of Bellaire v. Hennig,*
    No. 01-21-00077-CV, 2022 WL 210138
    (Tex. App.—Houston [1st Dist.] Jan. 25, 2022, no pet.) ............................................ 33

*City of Dallas v. Sanchez,*
    494 S.W.3d 722 (Tex. 2016) ...................................................................... 34, 39

*City of Haltom City v. Aurell,*
    380 S.W.3d 839 (Tex. App.—Fort Worth 2012, no pet.) ............................................ 24

*City of Lancaster v. Chambers,*
    883 S.W.2d 650 (Tex. 1994) ................................................................................ 46

*Colonial Sav. Ass'n v. Taylor,*
    544 S.W.2d 116 (Tex. 1976) ...................................................................... 21, 24

*Conkle v. Chery,*
    No. 03-08-00379-CV, 2009 WL 483226
    (Tex. App.—Austin Feb. 25, 2009, no pet.) ......................................................... 48

*Dallas Cnty. Mental Health & Mental Retardation v. Bossley,*
    968 S.W.2d 339 (Tex. 1998) ...................................................................... 33, 35

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
    907 S.W.2d 472 (Tex. 1995) ...................................................................... 32, 40

*Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.,*
    252 S.W.3d 586 (Tex. App.—Fort Worth 2008, pet. denied) ..................................... 24

*Elephant Ins. Co. v. Kenyon,*
    644 S.W.3d 137 (Tex. 2022) ................................................................................ 20

*Ellis v. United States,*
    673 F.3d 367 (5th Cir. 2012) .............................................................................. 18

*FEMA Trailer Formaldehyde Prods. Liab. Litig., In re,*
    668 F.3d 281 (5th Cir. 2012) ...................................................................... 5, 43

*Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.,*
  559 S.W.3d 537 (Tex. App.—Austin 2011), *judgment withdrawn, appeal dismissed*,
  No. 03-09-00566-CV, 2014 WL 5801862 (Tex. App. Nov. 5, 2014) ........................30

*Foster v. Integrity Mut. Ins. Co.,*
  999 F.3d 1103 (8th Cir. 2021) ................................................................ 25, 26

*Freyer v. Lyft, Inc.,*
  639 S.W.3d 772 (Tex. App.—Dallas 2021, no pet.) ......................................24

*FTS Int'l Servs., LLC v. Patterson,*
  No. 12-19-00040-CV, 2020 WL 5047913
  (Tex. App.—Tyler Aug. 26, 2020, pet. denied)................................................48

*Fuller v. Werner Enters., Inc.,*
  No. 3:16-CV-2958-BK, 2018 WL 3548886 (N.D. Tex. July 24, 2018) ......................48

*Hyde Park Baptist Church v. Turner,*
  No. 03-07-00437-CV, 2009 WL 211586
  (Tex. App.—Austin Jan. 30, 2009, pet. denied), *order vacated* (Oct. 22, 2010) ..... 51, 52

*IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason,*
  143 S.W.3d 794 (Tex. 2004) ................................................................32, 34, 35

*Johnson v. Sawyer,*
  47 F.3d 716 (5th Cir. 1995) ................................................................ 20, 43

*Kristensen v. United States,*
  993 F.3d 363 (5th Cir. 2021) ................................................................31

*Loom Craft Carpet Mills, Inc. v. Gorrell,*
  823 S.W.2d 431 (Tex. App.—Texarkana 1992, no pet.) ................................48

*Louviere v. Louviere,*
  839 So. 2d 57 (La. Ct. App. 2002)........................................................52

*Miranda v. TriStar Convenience Stores, Inc.,*
  No. 01-11-01073-CV, 2013 WL 3968337
  (Tex. App.—Houston [1st Dist.] Aug. 1, 2013, no pet.)................................34

vii

*Monell v. Department of Soc. Servs. of City of N.Y.*,
  436 U.S. 658 (1978) ...................................................................................42

*Morrone v. Prestonwood Christian Acad.*,
  215 S.W.3d 575 (Tex. App.—Eastland 2007, pet. denied) ................................ 44, 45

*Munoz v. City of Pearsall*,
  64 S.W.3d 119 (Tex. App.—San Antonio 2001, no pet.).....................................34

*Murray v. Nabors Well Serv.*,
  622 S.W.3d 43 (Tex. App.—El Paso 2020, no pet.) ........................................25

*Myers v. United States*,
  17 F.3d 890 (6th Cir. 1994) ..................................................................... 23, 26

*Nabors Well Servs., Ltd. v. Romero*,
  456 S.W.3d 553 (Tex. 2015) .......................................................................50

*Nall v. Plunkett*,
  404 S.W.3d 552 (Tex. 2013) .......................................................................21

*Otis Eng'g Corp. v. Clark*,
  668 S.W.2d 307 (Tex. 1983) ......................................................................21

*Pate v. Oakwood Mobile Homes, Inc.*,
  374 F.3d 1081 (11th Cir. 2004) ..................................................................27

*Plascencia v. Hillman*,
  No. EP-19-CV-40-PRM, 2019 WL 4087439 (W.D. Tex. July 3, 2019) .....................49

*Providence Health Ctr. v. Dowell*,
  262 S.W.3d 324 (Tex. 2008) ...............................................................33, 34, 39

*Roberts v. Healey*,
  991 S.W.2d 873 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).....................34

*Rosell v. Central W. Motor Stages, Inc.*,
  89 S.W.3d 643 (Tex. App.—Dallas 2002, pet. denied) ...................................... 19, 48

*Russell v. Jones*,
  49 F.4th 507 (5th Cir. 2022) ......................................................................42

*Ryder Integrated Logistics, Inc. v. Fayette Cnty.*,
  453 S.W.3d 922 (Tex. 2015) ............................................................33

*Sabia v. State*,
  669 A.2d 1187 (Vt. 1995) ............................................................30

*San Antonio State Hosp. v. Koehler*,
  981 S.W.2d 32 (Tex. App.—San Antonio 1998, pet. denied)............................... 33, 34

*Sanders v. United States*,
  937 F.3d 316 (4th Cir. 2019) ............................................................42

*Sheridan v. United States*,
  969 F.2d 72 (4th Cir. 1992) ............................................................26

*Stocker v. State*,
  264 A.3d 435 (Vt. 2021) ............................................................30

*Texas Dep't of Crim. Justice v. Hawkins*,
  169 S.W.3d 529 (Tex. App.—Dallas 2005, no pet.)..........................................33, 34, 35

*Texas Dep't of Mental Health & Mental Retardation v. Lee*,
  38 S.W.3d 862 (Tex. App.—Fort Worth 2001, pet. denied) ........................................34

*Texas Woman's Univ. v. The Methodist Hosp.*,
  221 S.W.3d 267 (Tex. App. —Houston [1st Dist.] 2006, no pet.)..............................25

*Thames Shipyard & Repair Co. v. United States*,
  350 F.3d 247 (1st Cir. 2003) ............................................................26

*Torrington Co. v. Stutzman*,
  46 S.W.3d 829 (Tex. 2000) ............................................................21

*Tri v. J.T.T.*,
  162 S.W.3d 552 (Tex. 2005) ............................................................52

*Turbe v. Government of Virgin Islands*,
  938 F.2d 427 (3d Cir. 1991) ............................................................ 23, 26

*Union Pump Co. v. Allbritton,*
   898 S.W.2d 773 (Tex. 1995),
   *abrogated on other grounds, Ford Motor Co. v. Ledesma,*
   242 S.W.3d 32 (Tex. 2007) ...................................................32, 38, 39

*Waffle House, Inc. v. Williams,*
   313 S.W.3d 796 (Tex. 2010) ...................................................................41

*Wansey v. Hole,*
   379 S.W.3d 246 (Tex. 2012) ...................................................................49

*Western Invs., Inc. v. Urena,*
   162 S.W.3d 547 (Tex. 2005) ...................................................................31

*Williams v. McCollister,*
   671 F. Supp. 2d 884 (S.D. Tex. 2009) ..................................................49

## Statutes:

Brady Handgun Violence Prevention Act,
   Pub. L. No. 103-159, 107 Stat. 1536 (1993) ........................................5
      § 103(b), 107 Stat. at 1541 ...............................................................5

18 U.S.C. § 922(b)(3) .................................................................................9

18 U.S.C. § 922(g) ......................................................................................5

18 U.S.C. § 922(t)(6) ...........................................................3, 6, 17, 41, 42, 46

18 U.S.C. § 925A .......................................................................................43

20 U.S.C. § 6736 ........................................................................................44

28 U.S.C. § 1291 ..........................................................................................4

28 U.S.C. § 1292(b) ...................................................................................12

28 U.S.C. § 1346(b)(1) ................................................................................4

28 U.S.C. § 2671 *et seq.* ............................................................................4

34 U.S.C. § 40901(b)(1) ...................................................................30

34 U.S.C. § 40901(e)(1)(C) ...............................................................6

Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) ..................47, 49, 50

Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a) ....................... 15, 49

Tex. Civ. Prac. & Rem. Code Ann. § 33.013(b) ....................... 15, 47

**Regulations:**

28 C.F.R. § 25.6(c)(1)(iii) ..................................................................5

28 C.F.R. § 25.6(c)(1)(iv)(A) .............................................................5

28 C.F.R. § 25.6(c)(1)(iv)(B) .............................................................5

28 C.F.R. § 25.6(c)(1)(iv)(C) .............................................................5

**Other Authorities:**

Dan B. Dobbs et al., *The Law of Torts* (2d ed.), Westlaw
    (database updated July 2022) ................................................ 23, 30

Restatement (Second) of Torts ........................................................ 22, 33

**INTRODUCTION**

This case arises from a tragedy of unspeakable proportions—one of the worst mass shootings perpetrated on American soil. On November 5, 2017, Devin Patrick Kelley arrived at the First Baptist Church of Sutherland Springs, Texas, a place that should have been a safe haven for all who entered. Kelley then massacred 26 worshipers and injured 22 others. The innocent victims of this tragedy, who are the plaintiffs here, have experienced terrible losses, and the United States unequivocally condemns the crime that caused that horror.

The question on appeal, however, is whether the United States bears legal responsibility for Kelley's attack. The district court held the United States liable based on its operation of a background-check system that failed to prevent Kelley from illegally acquiring the firearm used to carry out the massacre. There is no dispute that U.S. Air Force personnel failed to transmit to the National Instant Criminal Background Check System (NICS) information about Kelley that would have identified him as ineligible to purchase that firearm. The United States does not seek to excuse that oversight. But that mistake is not a legally proper basis for imposing liability on the United States under the Federal Tort Claims Act (FTCA), let alone for finding the United States more culpable for the deadly massacre than the shooter himself. The district court's contrary judgments rest on multiple legal errors.

The district court fundamentally misunderstood the showing required for plaintiffs to prevail on their negligent-undertaking theory. The court held that

negligent-undertaking liability could be imposed if the United States' negligent operation of NICS increased plaintiffs' risk of harm above that which would have existed in the case of non-negligent performance. That approach conflicts with bedrock principles of negligent-undertaking law. In Texas—as in every other jurisdiction—a plaintiff must show that the defendant's negligence in undertaking to provide a service to benefit the plaintiff or others increased the plaintiff's risk of harm above that which would have existed if there had been no undertaking at all. That standard was not satisfied in this case. Had NICS never been established, Kelley could have purchased firearms without even having to undergo a federal background check. Under settled law, liability therefore cannot be imposed on the United States for failing to prevent Kelley's firearm purchases.

In the alternative, the district court also posited that Kelley's ability to purchase a firearm illegally somehow increased the risk to the public by emboldening him psychologically. But the record provides no support for that conclusion. Kelley was a deeply disturbed individual who had longstanding violent tendencies. There is no evidence that Kelley's ability to purchase firearms without triggering an adverse response from NICS altered his state of mind and thus emboldened him to commit mass murder.

The district court also misapplied Texas law in holding that the United States' failure to submit information to NICS years before the shooting was a proximate cause of plaintiffs' injuries. Texas law recognizes that distance in time and space and

intervening events may preclude a finding of causation. Kelley's murderous rampage occurred approximately five years after the failure to transmit information to NICS and was preceded by many significant intervening events, including domestic turmoil in the days immediately before the shooting. The failure to forward information to NICS was too attenuated from Kelley's attack to constitute a legal cause of that attack. As to its emboldenment theory, the district court made no findings of causation at all, and the record reveals that none could have been made.

The district court also misunderstood the interaction of the FTCA with a provision of the Brady Handgun Violence Prevention Act that preempts tort liability for employees who are responsible for gathering information for NICS. *See* 18 U.S.C. § 922(t)(6). The district court wrongly denied the United States the protection of that provision, which expressly shields federal employees from tort liability stemming from the operation of NICS, mistakenly concluding that Texas law permits respondeat superior suits against employers even when federal law bars suit against their employees.

Finally, the district court compounded its error by determining not only that the United States was liable for Kelley's actions, but that it bore 60% of the responsibility for the attack. The United States was not more responsible for Kelley's acts than Kelley himself.

3

## STATEMENT OF JURISDICTION

The district court exercised jurisdiction under 28 U.S.C. §§ 1346(b)(1), 2671 *et seq.* ROA.19205. The district court entered final judgments on April 5, 2022. *E.g.*, ROA.33077-78. The United States timely filed notices of appeal on June 6, 2022. *E.g.*, ROA.33192. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether plaintiffs have demonstrated both the violation of an actionable duty under a negligent-undertaking theory and that the breach was a substantial cause of plaintiffs' injuries.

2.      Whether plaintiffs' claims are barred by the Brady Act.

3.      Whether the district court erred in apportioning 60% of liability for the mass shooting to the United States and only 40% to Kelley.

## STATEMENT OF THE CASE

### A.      Statutory and Regulatory Background

#### 1.      The Federal Tort Claims Act

The FTCA effects a limited waiver of sovereign immunity and creates a cause of action for certain tort claims against the United States. The statute authorizes the imposition of liability for the wrongful acts or omissions of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "[I]f a private person under 'like circumstances'

would be shielded from liability," however, "lower courts must decline to exercise subject-matter jurisdiction." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 289 (5th Cir. 2012).

### 2.    The Brady Act and the National Instant Criminal Background Check System

**a.** Federal law prohibits the possession of firearms by certain categories of individuals, including those with certain criminal histories. *See generally* 18 U.S.C. § 922(g). In 1993, Congress passed the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (Brady Act), to prevent the transfer of firearms to individuals who cannot lawfully possess them. To that end, Congress established a National Instant Criminal Background Check System (NICS) that federally licensed firearm dealers must contact to determine whether a potential purchaser can lawfully acquire a firearm. *See id.* § 103(b), 107 Stat. at 1541.

When prompted by a dealer, the FBI NICS Operations Center searches certain databases for records matching the prospective purchaser. 28 C.F.R. § 25.6(c)(1)(iii). If the search reveals that the purchaser cannot lawfully receive a firearm, the dealer is directed that the transaction must be "Denied." *Id.* § 25.6(c)(1)(iv)(C). If the search is inconclusive, the dealer may be directed that the transaction should be "Delayed" for up to three business days to allow an opportunity for further research. *Id.* § 25.6(c)(1)(iv)(B). If no disqualifying information is found, the dealer is informed that the transaction may "Proceed." *Id.* § 25.6(c)(1)(iv)(A).

5

The Brady Act also protects against tort liability from the operation of NICS: "Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages" for failing to prevent the sale of a firearm to a person who may not lawfully possess one. *See* 18 U.S.C. § 922(t)(6).

**b.** To facilitate NICS operations, federal agencies must submit information in their records establishing that an individual is prohibited from possessing a firearm. 34 U.S.C. § 40901(e)(1)(C). The Department of Defense (DOD) and the Air Force have issued their own instructions to ensure compliance with this reporting obligation. DOD instructions generally provide that a military subject's fingerprints be submitted to the FBI upon a determination that there is probable cause to believe the subject committed a listed offense and that information regarding the final disposition also be submitted following the conclusion of the proceeding. ROA.19168-69, 55654. The Air Force Office of Special Investigations (AFOSI) Manual 71-121 contained similar instructions and required AFOSI unit leadership to, *e.g.*, ensure that agents "obtain and validate subject's fingerprints" and "submit subject's fingerprints and dispositions to the FBI" before a file was closed. ROA.19169-70 (alterations and quotation marks omitted); *see* ROA.54944.

6

### B.    Factual Background

**1.** Beginning in 2010, Kelley served in the Air Force, and was eventually stationed at Holloman Air Force Base in New Mexico, where he lived with his then-wife and infant stepson. ROA.19165, 19172. In June 2011, AFOSI Detachment 225—a law enforcement unit at Holloman—began investigating Kelley for suspected abuse of his stepson. ROA.19165, 19173. Shortly thereafter, another Holloman law enforcement unit—the 49th Security Forces Squadron (SFS)—began investigating whether Kelley assaulted his wife. ROA.19165, 19174.

While these investigations continued, Kelley displayed dangerous and erratic behavior. He physically and emotionally abused his wife, ROA.19175-76; was twice hospitalized in a mental-health facility and twice went AWOL, ROA.19177, 19181, 19183; and "threatened a mass shooting at [Holloman]," ROA.19176. Kelley also purchased two firearms from the Holloman Base Exchange, including a handgun in April 2012, for which the Exchange received a "proceed" response from NICS. ROA.19177, 19179. It is undisputed that Kelley was not disqualified from purchasing a firearm at that time. ROA.19223.

In August 2012, charges against Kelley were referred to a general court-martial, and Kelley pleaded guilty to assaulting his wife and stepson. ROA.19188. Kelley was sentenced to a bad-conduct discharge, 12-months' confinement, and a reduction in rank. ROA.19188. Kelley was released in March 2013; was separated from the Air Force in April 2014; and received his bad-conduct discharge in May 2014.

7

ROA.19190. Upon his final conviction, Kelley became legally barred from possessing firearms.

As part of their investigations, SFS and AFOSI personnel were required to collect and submit Kelley's fingerprints and disposition record to the FBI for inclusion in NICS. *See* ROA.19179, 19184, 19189. AFOSI agents collected Kelley's fingerprints in June 2011 when he was first interviewed. ROA.19173. But neither those prints, nor the ultimate record of Kelley's conviction, was submitted to the FBI.

**2.** Between 2014 and 2017, Kelley repeatedly sought to purchase firearms from federally licensed dealers despite his disqualifying conviction. ROA.19165. Once, a dealer denied Kelley's purchase because of a store policy regarding sales to purchasers presenting out-of-state identification. ROA.33798:16-19. But on four occasions, Kelley successfully purchased the firearms by falsely certifying on ATF Form 4473 that he had never been convicted of a felony or a misdemeanor crime of domestic violence. ROA.19165, 19193-94, 19196, 19198; *see* ROA.70242, 70245, 70252, 70267. Kelley chose to lie on these forms notwithstanding a warning that he could face "up to ten years imprisonment and/or up to a $250,000 fine." ROA.34365:18-67:1. The dealers received "proceed" responses from NICS and completed those transactions. ROA.19165.

On April 7, 2016, Kelley purchased the rifle that he would use 18 months later at the First Baptist Church—a Ruger AR-556 rifle that he obtained at an Academy Sports + Outdoors store in San Antonio, Texas. ROA.19196, 19202. Kelley presented

a Colorado driver's license and listed a Colorado residence. ROA.19196, 19257. The

sale of this AR-556 rifle was inconsistent with "Colorado's ban on large-capacity

magazines," ROA.19257-58, and thus violated federal law, which allows for sales to

out-of-state residents only if the sale fully complies with the laws of "both" the

dealer's State and the purchaser's home State, ROA.19258; 18 U.S.C. § 922(b)(3).

Nevertheless, Academy's employees incorrectly certified that the transaction complied

with all applicable laws. ROA.19257. Academy consulted NICS and received a

response that the sale could "proceed." ROA.19165.

**3.** The years following Kelley's discharge were a time of personal turbulence for

him. Kelley married Danielle Smith, whom he soon began abusing. ROA.19190,

19192. Kelley refused to hold down a job. ROA.33765:18-23, 19197.

Kelley developed a contentious relationship with Smith's family. *See*

ROA.19193, 19197-98. The conflict involved episodes in which Kelley bullied Smith's

severely disabled stepbrother and "instigated a fight with" Smith's mother,

grandmother, and stepfather. ROA.19197. The situation "further escalated" in May

2017, with the birth of Kelley and Smith's second child. ROA.19198. Kelley "became

extremely aggressive" and barred Smith's mother and grandmother from coming to

the hospital for the birth, texting them: "If for any reason you attempt to insert

yourself between Danielle and I again I will personally make it my mission to destroy

your entire life." ROA.19198.

As early as July 2017, Kelley began planning to commit a mass shooting. ROA.34009, 34017. Among other preparations, Kelley purchased a bulletproof vest and tactical gear. ROA.34026:6-27:4. And Kelley left himself reminders of various tasks to complete before the attack. ROA.19198-99 (*e.g.*, "'try on and reorganize gear,'" "'Put gun stuff in car when [Smith] doesn't notice'").

Kelley's relationship with Smith and her family was particularly strained in the days leading up to November 5, 2017. Smith had been subpoenaed to testify against her foster father in a sexual abuse trial, and Kelley opposed her testifying. ROA.19190-91, 19200-01. Kelley was also upset by a visit from police officers who came to the Kelley family property to retrieve alleged photographs and videos of the abuse. ROA.19199-201, 34073:21-74:6. Around that time, Smith asked Kelley for a divorce. ROA.19201.

**4.** On the morning of November 5, 2017, Kelley bound Smith and donned black tactical gear and a black mask. ROA.19201-02. Kelley drove to the First Baptist Church of Sutherland Springs, the church in which Smith had grown up and where Smith's family regularly attended services. ROA.19191, 19203, 19244. Kelley began discharging his rifle at the outside of the church, firing a total of 254 shots at the building at head height. ROA.19202, 33997:1-98:13. Kelley then entered the church and fired another 196 shots with the rifle. ROA.33999:7-11; *see* ROA.19202. Kelley shot men, women, and children, including at close range. ROA.34000:6-18. The

shooting lasted seven-and-a-half minutes. ROA.33999:15-17. In that time, Kelley

murdered 26 people and wounded 22 others. ROA.19202.

Kelley fled the scene and died from "a self-inflicted gunshot wound to the

head." ROA.19203.

### C.    Prior Proceedings

Surviving victims of Kelley's attack and estates of those he murdered sued the

United States under the FTCA. The suits (which were consolidated, ROA.280-82)

generally alleged that the United States was liable for Kelley's actions because it

should have prevented Kelley from obtaining the rifle that he used in his attack.

Plaintiffs' theories included negligent undertaking and negligent supervision.

ROA.19166.

**1.** The United States moved to dismiss arguing (as relevant here) that a private

person would not be liable for negligence in like circumstances under Texas law and

that the Brady Act precluded liability. ROA.353-63, 368-69. The court held that Brady

Act immunity does not preclude this action because it protects federal employees but

not the United States itself. ROA.626-31. The court further held that even if that

provision did cover the United States, the exemption from liability would apply only

to the failure to transmit information to NICS, not other allegedly negligent conduct

such as the failure to collect Kelley's fingerprints and properly train and supervise

agents responsible for collecting and submitting information. ROA.631-32.

11

The district court also concluded that plaintiffs stated negligent-undertaking claims under Texas law. ROA.638-43. There is no general duty under Texas law to protect others from harm, but such a duty can arise under the negligent-undertaking doctrine if a person undertook to render services for the protection of another and increased the injured parties' risk of harm. ROA.640. The court concluded that, "in undertaking to establish a complex national background-check system," the United States "assumed the duty not to operate this system negligently." ROA.641. In considering whether the United States had increased plaintiffs' risk of harm, the court viewed the relevant question as whether negligent operation of the background-check system made injury more likely than non-negligent operation of the system, rather than whether plaintiffs were any worse off as compared to a world without NICS. Applying that framework, the court concluded that plaintiffs had sufficiently alleged that the government increased plaintiffs' risk of harm. ROA.643.

The United States asked the court to certify its ruling for potential interlocutory review under 28 U.S.C. § 1292(b), but the court denied that motion. ROA.3083-92.

**2.** Following discovery, the parties moved for summary judgment. The district court denied the motions in relevant part. *See* ROA.11620-77.

In considering the negligent-undertaking claims, the district court held that the government had failed to exercise reasonable care "in performing its FBI reporting obligations." ROA.11639. But the court found genuine disputes of material fact as to whether the government's conduct increased the risk of harm, ROA.11645, or

proximately caused plaintiffs' injuries, ROA.11651, 11656. On the risk-of-harm issue, the court rejected the government's argument that under Texas law "the 'relevant inquiry is whether the risk to Plaintiffs would have been lower if the Government had not operated the background check system at all.'" ROA.11640. Instead, the court reiterated its position that "the relevant question is whether the risk of harm would have been lower if the Government had performed its duties with reasonable care." ROA.11642.

The court also advanced a theory never suggested by plaintiffs, positing that the government's negligence might have "*encouraged* Kelley's unlawful firearms purchases." ROA.11644. Such a showing, the court stated, "would likely satisfy" the government's formulation of the negligent-undertaking standard (though the court did not elaborate on why this would have made Kelley any more prone to perpetrate a mass shooting as compared to a world without NICS).[1]

In denying the government's motion for summary judgment on the negligent-supervision claims, the district court concluded that AFOSI Detachment 225 leadership had a non-discretionary duty to review case files before they were closed to ensure that fingerprints and final disposition information were submitted to the FBI.

---

[1] No analogous theory of how plaintiffs might prevail under the government's formulation of the risk-of-harm inquiry appeared in plaintiffs' briefs. *See* ROA.6629-31, 9387-92, 10185-87, 10912-15, 11400-02.

ROA.11664-65. The court also declined to dismiss the negligent-supervision claims as impermissibly duplicative of the negligent-undertaking claims. ROA.11672-76.

**3.** After a bench trial on liability, the district court issued its Findings of Fact and Conclusions of Law. ROA.19164-262.

**a.** The district court concluded that plaintiffs had demonstrated liability based on a negligent-undertaking theory, finding that "the Government assumed a duty under the common law to operate the NICS with reasonable care." ROA.19216. The court concluded that Air Force personnel at Holloman breached this standard of care when they failed to submit Kelley's information to NICS in 2012. ROA.19218-19.

The district court also concluded that the undertaking increased plaintiffs' risk of harm. ROA.19220-25. The court reiterated that it had determined that the government's conduct should be compared to "non-negligent performance," and concluded that plaintiffs had satisfied that standard. ROA.19220-22. The court further concluded that "by confirming Kelley's perception that he was above the law, the Government's negligent operation of the NICS with respect to Kelley created a greater risk of harm than if it had never undertaken to establish a background check system at all." ROA.19220. As support, the court cited delays in responding to Kelley's conduct during the investigations at Holloman and Kelley's successful firearms purchases. ROA.19222-24. The court particularly emphasized Kelley's April 2012 handgun purchase from the Holloman Base Exchange. ROA.19223. While acknowledging that there was no legal bar to Kelley's purchase of a firearm at that

time, the court concluded that, had Kelley experienced a delay in the transaction (as could have occurred if agents submitted his fingerprints to NICS while the investigation was ongoing), that "delay would have put Kelley on notice that the Air Force was aware of his criminal conduct and took it seriously." ROA.19223.

The district court also held that the government's conduct proximately caused plaintiffs' injuries. ROA.19225-52. The court emphasized that "every gun Kelley owned on the day of the shooting was purchased through a[ federally licensed dealer]." ROA.19228-29. The court thus concluded that the Air Force's failure to submit Kelley's criminal history to NICS was a cause in fact of the shooting. ROA.19233-34.

**b.** The district court also determined that plaintiffs established their negligent-supervision claims against AFOSI Detachment 225 leadership. ROA.19252-57. The court found that leadership "closed Kelley's investigative file without confirming that Kelley's fingerprints and final disposition report had been submitted to the FBI." ROA.19254-55.

**c.** Under Texas law, a defendant is ordinarily liable "only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury." Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a). Where the "percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent," however, the defendant is jointly and severally liable for the full amount of damages recoverable. *Id.* § 33.013(b).

The court apportioned 60% of the responsibility for Kelley's shooting to the United States by attributing 20% of responsibility to AFOSI agents and SFS personnel and 40% to AFOSI Detachment 225 leadership. ROA.19261. The court allocated only 40% of the responsibility to Kelley. ROA.19261.[2]

**4.** The court ultimately awarded plaintiffs approximately $230 million in damages. ROA.32691-875. Because the court had attributed more than 50% of the responsibility for Kelley's shooting to the United States, the government faces joint-and-several liability for that entire amount.

## SUMMARY OF ARGUMENT

The attack on innocent victims at the First Baptist Church of Sutherland Springs was an inexpressible tragedy and the United States unequivocally does not seek to excuse the Air Force's failure to submit Kelley's fingerprints and record of conviction for inclusion in NICS databases. Nonetheless, under settled Texas and federal law, the United States is not liable for Kelley's actions, and is certainly not more responsible for those acts than the murderer himself.

**I.** Under Texas negligent-undertaking law, plaintiffs needed to show that the undertaking—the creation and operation of NICS—increased their risk of harm. The district court fundamentally misconstrued that requirement in deeming it sufficient for plaintiffs to show that negligent operation of NICS created greater risks than non-

---

[2] The court allocated no responsibility to Academy. ROA.19257-61.

negligent operation of that system. Texas allows the imposition of liability only when the undertaking created greater risks of harm than would have existed if there had been no undertaking at all. Because it is not controverted that Kelley could have purchased a firearm without any federal background check if NICS had never been established, plaintiffs' negligent-undertaking claims fail.

The district court alternatively concluded that Kelley's success in illegally purchasing firearms emboldened him to commit the shooting. But there is no evidence whatsoever that his illegal purchase of firearms significantly altered Kelley's state of mind, much less caused him to perpetrate the subsequent attack. Rather, the district court's factual findings conclusively establish that Kelley was predisposed to violence before he became ineligible to purchase firearms.

The district court separately misapplied Texas's law of proximate causation. The United States' failures in 2012 were temporally, geographically, and causally attenuated from Kelley's intentional and horrific wrongdoing in 2017. Texas courts do not impose liability under such circumstances.

And because there was no basis for finding negligent-undertaking liability, the district court also erred in finding negligent-supervision liability.

**II.** The district court also misapprehended the interaction of the FTCA and the provision of the Brady Act that preempts tort liability. *See* 18 U.S.C. § 922(t)(6). The court stressed that the Brady Act refers only to state and federal employees, not to state and federal governments. But liability under the FTCA is exclusively respondeat

superior liability, and under settled vicarious liability principles, the United States as employer cannot be liable for damages where its employees would not be. The court concluded, however, that under Texas law, employers may be held liable on respondeat superior grounds even if the employee's liability is preempted by federal law. The district court cited no authority for this proposition, which conflicts with Texas law.

The district court also concluded that the Brady Act's liability shield protects only those employees directly involved in reporting information to NICS. This misconstrues the provision's breadth.

**III.** Even if the United States could be liable, the court erred in apportioning 60% of the responsibility to the United States (20% for line employees and 40% for supervisors), leaving only 40% for Kelley. The court committed legal error in apportioning a share of responsibility to the United States under a negligent-supervision theory after already imposing liability for the acts of the supervised line employees—under Texas law, these theories are mutually exclusive. Moreover, the court erred by holding the United States more responsible for Kelley's outrages than Kelley himself.

## STANDARD OF REVIEW

This Court reviews factual findings for clear error and reviews legal conclusions de novo. *Ellis v. United States*, 673 F.3d 367, 372 (5th Cir. 2012). In reviewing the apportionment of liability, the Court considers whether the award is "manifestly

18

unjust." *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied).

## ARGUMENT

The United States decries gun violence and in particular the scourge of mass shootings that plagues our Nation. Nothing in this appeal diminishes the horrors that plaintiffs have suffered and continue to suffer. But in holding the United States liable for Kelley's actions, the district court committed multiple independent legal errors warranting reversal.

First, the district court relied on two alternative theories to establish negligent-undertaking liability, neither of which withstands scrutiny. The court erred in its primary holding that the United States' negligent operation of NICS was sufficient to establish negligent-undertaking liability because it increased the risk of plaintiffs' harm compared to a world in which the United States operated NICS without negligence. And the court erred in alternatively concluding that the negligence emboldened Kelley to commit a mass shooting. Reversal of those holdings requires reversal of the judgment.

Second, the district court erred in finding that the United States' failure to update NICS was the proximate cause of Kelley's intentional and malicious acts five years later. Reversal on that ground requires reversal of the judgment.

Third, the district court erred in holding the Brady Act's liability shield inapplicable even though the federal employees who committed negligent acts are

exempt from liability. Reversal on that ground requires at least reversal of the share of liability allocated to line employees and full reversal if the Court also recognizes, as it should, that all conduct at issue is protected from liability.

Finally, the district court erred in two respects in holding the United States 60% liable for Kelley's murderous acts—first, by double-counting liability for negligent acts and negligent supervision and, second, by apportioning more blame to the United States than to Kelley himself. Reversal on those grounds would require a substantial reduction in the portion of damages for which the United States is liable.

## I.     The United States Did Not Breach An Actionable Duty Arising From A Negligent Undertaking Or Proximately Cause Plaintiffs' Injuries

Under the FTCA, plaintiffs had to demonstrate each of the substantive elements of a negligence action under Texas law. ROA.19205; *see also Johnson v. Sawyer*, 47 F.3d 716, 727-28 (5th Cir. 1995) (en banc). The district court erred in imposing liability because plaintiffs failed to satisfy two of these requirements: the breach of an actionable duty and that the government proximately caused the injuries inflicted by Kelley.

### A.     Plaintiffs failed to establish the predicates for negligent-undertaking liability

**1.** Under Texas law, there is no general duty to provide protection from harms created by others (such as Kelley). *See Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 151 (Tex. 2022). Plaintiffs proceeded under a limited exception to this rule that authorizes

liability for negligent undertakings. Texas, like many states, draws its negligent-undertaking law from two closely related provisions of the Restatement (Second) of Torts, sections 323 and 324A. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000); *see also* ROA.19220 (acknowledgment by the district court that Texas law "[d]raw[s] on Section 323").[3]

Negligent-undertaking liability requires the defendant to have rendered services for the protection of another and then failed to exercise reasonable care in performing those services. That showing is necessary, but not sufficient. To establish a violation, the plaintiff must also show either that the defendant's negligence in performing the undertaking increased the risk of physical harm to the plaintiff or that his harm resulted from reasonable reliance on the undertaking. *See Nall v. Plunkett*, 404 S.W.3d 552, 555-56 (Tex. 2013) (per curiam); *see also Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976). These two alternative bases for imposing liability—increased risk of harm or reliance—stem from a common underlying premise: "While a person is generally under no legal duty to come to the aid of another," liability can fairly be imposed on those who take an "affirmative act which might worsen the situation." *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). Mere failed attempts to assist—even when negligently performed—are not a sufficient basis for imposing

---

[3] Section 323 addresses liability to the person for whom services are rendered through the undertaking, whereas Section 324A addresses liability to third parties affected by the performance of the undertaking.

liability because it "is socially desirable" to encourage others to "give gratuitous aid"; thus, for example, "one who finds another in some lonely place severely wounded, unconscious, and in urgent need of first aid treatment" should be able to attempt to render assistance "without fear of liability." Restatement (Second) of Torts § 323 cmt. b.

Under these principles, the United States had no legal duty here. The United States undertook to operate NICS to enable licensed firearm dealers to determine whether a prospective purchaser can legally acquire a firearm. Almost all of the plaintiffs here have disclaimed that they relied on the operation of NICS, and the district court agreed that plaintiffs could not establish liability under a reliance theory. ROA.11640, 19220.

Thus, plaintiffs had to establish that the negligent operation of the background-check system increased plaintiffs' risk of harm beyond the risk that would have existed if the United States had never undertaken to operate the background-check system at all. That is plainly not the case. Without NICS, Kelley would have been able to purchase the same firearms from federally licensed firearm dealers.

**2.** The district court misapprehended the relevant framework. Instead of inquiring whether the government increased plaintiffs' risk of harm from Kelley, the court asked "whether the risk of harm would have been lower if the Government had performed its duties with reasonable care." ROA.11642; *see* also ROA.643. Thus, in its post-trial Findings of Fact and Conclusions of Law, the court declared that the

relevant inquiry is not "whether Kelley would have been able to obtain firearms [from a federally licensed dealer] if NICS had never been in operation," but whether the risk of injury and death would have been lower had the government collected and submitted Kelley's fingerprints and criminal history data to the FBI. ROA.19221. Plaintiffs prevailed under that standard because "the negligent operation of the NICS increases the risk of harm to the general public compared to non-negligent performance." ROA.19222.

The district court's approach to negligent-undertaking law, which allows for the imposition of liability if an undertaking merely failed to provide the hoped-for benefit, has been definitively rejected in Texas and elsewhere. *See* Dan B. Dobbs et al., *The Law of Torts* § 410 (2d ed.), Westlaw (database updated July 2022) (recognizing inquiry is whether "the defendant's failure to exercise reasonable care increased the risk of harm so that it was more than it would have been with no undertaking"). It effectively collapses the questions of duty and negligence because "[w]hen protective services are performed negligently, the risk of harm to the beneficiary will always be greater than when those services are performed competently." *Turbe v. Government of Virgin Islands*, 938 F.2d 427, 432 (3d Cir. 1991); *see Myers v. United States*, 17 F.3d 890 (6th Cir. 1994) (similar).

Texas law, and the Restatement principles that it reflects, reject the district court's approach. In *Colonial Savings Ass'n*, the plaintiff sought to recover for the defendant bank's failure to purchase fire insurance for a structure on his property,

23

alleging that the bank had led him to believe that it would acquire the insurance. 544 S.W.2d at 118. The jury decided in the plaintiff's favor, finding the bank negligent, but without finding whether the plaintiff relied on the bank's statements. *Id.* The intermediate court concluded that it was enough that having undertaken to provide insurance, the bank had a duty "to act in a non-negligent manner." *Id.* The Texas Supreme Court reversed, holding that the plaintiff could not prevail on an increased-risk-of-harm theory. *Id.* at 120. The court explained that unless the bank's representation dissuaded the property owner from purchasing coverage he otherwise would have obtained himself (*i.e.*, induced reliance), the bank's "failure to provide insurance would have left [the property owner] in *no worse condition than if [the bank] had never undertaken to provide insurance in the first place*." *Id.* (emphasis added).

Subsequent Texas decisions confirm that "in determining whether there is an increased risk of harm, we compare the risk of harm resulting from the negligence *to that existing before the undertaking*." *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 599 (Tex. App.—Fort Worth 2008, pet. denied) (emphasis added). There can be liability only where the plaintiff "was worse [off] because of the [defendant's] actions than if the [defendant] had never recognized the danger and had never expressed an intention to remedy it." *City of Haltom City v. Aurell*, 380 S.W.3d 839, 859 (Tex. App.—Fort Worth 2012, no pet.); *see Freyer v. Lyft, Inc.*, 639 S.W.3d 772, 789-90 (Tex. App.—Dallas 2021, no pet.) (determining allegedly negligent background check

did not increase the risk of harm); *see also Murray v. Nabors Well Serv.*, 622 S.W.3d 43, 54 (Tex. App.—El Paso 2020, no pet.).

The district court mistakenly believed Texas law to be inconsistent on this point. ROA.11641. But the only case identified by the court as running contrary to this body of precedent, *Texas Woman's University v. The Methodist Hospital*, 221 S.W.3d 267 (Tex. App. —Houston [1st Dist.] 2006, no pet.), did not analyze the baseline for evaluating increased risk of harm. Although the opinion makes passing reference to increased risk of harm, *id.* at 285, its analysis focused on the plaintiff's reliance on the defendant's undertaking—a distinct mode of establishing liability not at issue here. *See id.* at 284-85 (concluding that there was evidence that "[the plaintiff] depended upon [the defendant's] representations" and that there was a factual question as to whether "[the plaintiff] relied upon [the defendant's] performance").

The negligent-undertaking analysis consistently applied by Texas courts accords with this Court's understanding of the same Restatement provisions followed by Texas. This Court has recognized that a negligent-undertaking claim "requires some change in conditions that increases the risk of harm to the plaintiff *over the level of risk that existed before the defendant became involved.*" *Canipe v. National Loss Control Serv. Corp.*, 736 F.2d 1055, 1062 (5th Cir. 1984) (emphasis added).

Other courts of appeals have consistently interpreted the same Restatement principles the same way. For example, in *Foster v. Integrity Mutual Insurance Co.*, 999 F.3d 1103 (8th Cir. 2021), the Eighth Circuit considered whether liability could be imposed

based on negligent performance of a background check that failed to uncover that a taxi driver had a previous conviction for driving while intoxicated. Applying state law derived from the Restatement, the court concluded that "the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun performance" and, thus, no liability could be imposed because the entity performing the background check "did not put [the plaintiff] in a worse situation" by failing to flag the prior conviction. *Id.* at 1106.

Decisions of the First, Third, Fourth, Sixth, Ninth, Tenth, and Eleventh Circuits also construe the Restatement consistent with that same understanding. *See Myers*, 17 F.3d at 903 (explaining that the test "is not whether the risk was increased over what it would have been if the defendant had not been negligent," but, "[r]ather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all"); *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 261 (1st Cir. 2003) (quoting *Myers*); *Turbe*, 938 F.2d at 432 (finding "[Section] 323(a) applies only when the defendant's actions increased the risk of harm to the plaintiff relative to the risk that would have existed had the defendant never provided the services initially"); *Sheridan v. United States*, 969 F.2d 72, 74-75, 74 n.3 (4th Cir. 1992) (finding no liability where the plaintiff "suffered no greater risk of harm . . . because of the gratuitous promulgation of . . . regulations and their breach than if the United States had never promulgated such regulations in the first instance"); *Aguirre v. United States*, 44 F. App'x 156, 156-57 (9th Cir. 2002)

(unpublished) (finding "negligent government inspections do not on their own create 'good samaritan' liability because they do not increase the risk of harm"); *Ayala v. United States*, 49 F.3d 607, 614 n.5 (10th Cir. 1995) (noting increased-risk-of-harm argument would be futile where the "plaintiffs could not show that [federal employee's conduct] increased the risk of injury to the [plaintiffs] over what it would have been had [the employee] done nothing at all"); *Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1086 n.4 (11th Cir. 2004) (finding no increased risk of harm where the government failed to "ensure the abatement of a pre-existing hazard" but "did not increase the hazard").

The district court's approach departs from that of Texas courts and of the many other courts applying the same Restatement standards.

**3.** The district court alternatively concluded that the government had increased the risk of harm even under the proper standard because oversights in collecting and submitting Kelley's information "emboldened Kelley" by "confirming Kelley's perception that he was above the law." ROA.19220, 19225. The court's emboldenment discussion cites only generic testimony that Kelley believed himself to be above the law, ROA.19224 (citing testimony at ROA.35159); it cites no evidence—and none exists—tying that belief to the operation of NICS. And it cites no evidence—and none exists—establishing that the failure to submit data to NICS made Kelley any more likely to perpetrate the attack. Indeed, the court's own findings preclude any suggestion that Kelley's success in completing prohibited firearms

transactions was a contributing factor to this belief or increased his propensity for violence.

The court's findings establish that Kelley was a deeply disturbed individual with strong tendencies to violence long before the Sutherland tragedy and before the conviction that legally prohibited him from purchasing firearms. The court found that "Kelley's mental health was already compromised [in 2012] while he was in the Air Force," that he already posed "the threat . . . for mass shooting or mass murder, and that Kelley's mental state did not substantially deteriorate after he left the Air Force." ROA.19243; *see also* ROA.19241 ("Kelley's mental state did not materially change between 2012 and 2017," when he perpetrated the attack.) (formatting omitted); ROA.19240 (finding that "at every stage in [Kelley's] life . . . the threat of violence loomed"). The court noted a personality assessment conducted in 2012, which found that "Kelley had 'a personality disorder that is a mixture of antisocial, narcissistic, and borderline personality features.'" ROA.19241. The assessment also "indicate[d] that '[h]e endorsed a number of extreme and bizarre thoughts, suggesting the presence of delusions and/or hallucinations. He apparently believe[d] that he has special mystical powers or a special "mission" in life that others do not understand or accept.'" ROA.19242 (second alteration in original). The district court emphasized these facts as evidence that Kelley's mass shooting should have been foreseeable to the Air Force in 2012. But they demonstrate that Kelley's predisposition to extreme violence long predates his successful post-conviction weapons purchases.

The district court's error is further illustrated by its focus on Kelley's misconduct in the period before his conviction, which only underscores that Kelley's violence predated, and was not a product of, his ineligibility to purchase firearms. ROA.19223-24. And the court particularly erred in focusing on Kelley's handgun purchase in April 2012, while he was still under investigation for domestic violence. ROA.19222-23. The court acknowledged that at the time of that purchase, Kelley would not have "been disqualified from purchasing" that handgun (because he had not yet been convicted). ROA.19223. And that weapon was not used in the 2017 attack. ROA.19202. The court nonetheless deemed this purchase relevant by reasoning that if the government had collected Kelley's fingerprints in February 2012, when the domestic violence allegations against Kelley were first deemed credible, "it is likely that the [April 2012] transaction would have been delayed," which "would have put Kelley on notice that the Air Force was aware of his criminal conduct and took it seriously." ROA.19223. That conclusion is entirely speculative. Nothing suggests that Kelley believed that the Air Force failed to take his conduct seriously. And the Air Force demonstrated to Kelley that it took his conduct seriously when he was court-martialed, sentenced to a period of confinement, and given a "bad conduct" discharge. ROA.19188. That very real discipline plainly demonstrated that Kelley was not treated as being above the law. There is no evidence that Kelley perceived otherwise.

Moreover, there is no nexus between the April 2012 handgun purchase and the United States' undertaking. *See Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 559 S.W.3d 537, 547 (Tex. App.—Austin 2011) (recognizing the need for a "nexus" between the voluntary undertaking and the alleged negligence), *judgment withdrawn, appeal dismissed*, No. 03-09-00566-CV, 2014 WL 5801862 (Tex. App. Nov. 5, 2014); Dobbs, *supra*, § 410 (explaining "the increased-risk clause" allows for imposition of liability based only on "harms resulting from the risk that the undertaking was intended or reasonably expected to protect against"). The United States established a background-check system to provide licensed firearm dealers with information about "whether receipt of a firearm by a prospective transferee would violate" federal or state law, 34 U.S.C. § 40901(b)(1), thereby preventing unlawful firearms transactions. The United States did not undertake to use fingerprint collection and NICS screenings as a means of chastening individuals suspected of crimes but not yet legally ineligible to purchase weapons. The potential psychological effects of Kelley's lawful purchase of a firearm are far too attenuated from the purpose of the undertaking to be a proper basis for imposing liability.[4]

---

[4] The errors in the district court's emboldenment analysis are also underscored by its reliance on a decision of the Supreme Court of Vermont that has since been disavowed by that same court. *See* ROA.19225 (citing with approval *Sabia v. State*, 669 A.2d 1187 (Vt. 1995)); *Stocker v. State*, 264 A.3d 435, 452 (Vt. 2021) (concluding "[o]ur analysis in *Sabia* does not persuade us" because it is incompatible with the principle that "allowing a risk of harm to continue unabated, without affirmatively making it worse" is not a proper basis for good Samaritan liability).

**B.     The United States' conduct did not proximately cause plaintiffs' injuries**

Even if plaintiffs could establish a breach of an actionable duty, their claims would fail under Texas law because the government did not proximately cause their injuries. This is true as to plaintiffs' primary theory of liability, which asserts that the government bears responsibility for Kelley's intentional actions because governmental missteps in 2012 resulted in a failure to prevent the sale of the rifle Kelley used in 2017. And evidence of proximate causation is entirely absent for the alternative "emboldenment" theory.

**1.     Causation based on Kelley's ability to purchase the firearm**

**a.** "Under Texas law, a plaintiff must show both foreseeability and cause in fact to establish proximate causation." *Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021). These requirements "cannot be established by mere conjecture, guess, or speculation." *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005).

To establish cause in fact, a plaintiff must demonstrate not only but-for causation but that the negligent conduct was "a substantial factor" in causing the injury. *Urena*, 162 S.W.3d at 551. To be considered "substantial" in this sense, the conduct must have "such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility." *Bostic v. Georgia-Pac. Corp.*, 439 S.W.3d 332, 350 (Tex. 2014) (quotation marks omitted). It is not sufficient for a defendant's conduct to

31

merely "furnish a condition which made the injury possible." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). The injury must be "the natural and probable result" of the conduct. *Id.* (quotation marks omitted); *see also IHS Cedars Treatment Ctr. of DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 802 (Tex. 2004) (no proximate causation where defendant "merely allowed" plaintiff to be in a situation where she experienced harm).

Because Texas "law does not hold one legally responsible for the remote results of his wrongful acts," a "line must be drawn between immediate and remote causes." *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995) (quotation marks omitted), *abrogated on other grounds*, *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). Drawing this line between immediate causes that can satisfy the substantial-factor requirement and remote causes that cannot requires "apply[ing] a practical test, the test of common experience." *Id.* (quotation marks omitted). And although proximate causation "is generally a question of fact, some causes in fact do not constitute legal causation as a matter of law," including "when the relationship between the plaintiff's injuries and the defendant's negligence is attenuated or remote." *Ambrosio v. Carter's Shooting Ctr., Inc.*, 20 S.W.3d 262, 266 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see Askanase v. Fatjo*, 130 F.3d 657, 676 (5th Cir. 1997) ("Under Texas law, a cause of action is *legally insufficient* if the defendant's alleged conduct did no more than furnish the condition that made the plaintiff's injury possible." (emphasis added)); *IHS Cedars*, 143 S.W.3d at 803 (upholding grant of

32

summary judgment to defendant based on lack of proximate causation, notwithstanding plaintiff's expert testimony on causation).

In making these legal determinations, Texas courts consider whether "an alleged cause is geographically, temporally, or causally attenuated from the alleged effect." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929-30 (Tex. 2015) (per curiam) (quotation marks omitted). Relevant temporal attenuation can include time gaps of mere days or hours between the defendant's conduct and the plaintiff's injuries. *See, e.g.*, *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 325, 328 (Tex. 2008) (33 hours gap); Restatement (Second) of Torts § 433 cmt. f ("Where the time has been long, the effect of the actor's conduct may thus become so attenuated as to be insignificant and unsubstantial as compared to the aggregate of the other factors which have contributed.").[5] Similarly, geographic attenuation supports a determination of remoteness at distances as short as half a mile. *See, e.g.*, *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998) (considering half-mile

---

[5] *See also Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998) (same day); *San Antonio State Hosp. v. Koehler*, 981 S.W.2d 32, 34, 36 (Tex. App.—San Antonio 1998, pet. denied) (within three days); *Cherry v. Texas Dep't of Crim. Justice*, 978 S.W.2d 240, 244 (Tex. App.—Texarkana 1998, no pet.) (36 hours); *Texas Dep't of Crim. Justice v. Hawkins*, 169 S.W.3d 529, 531, 534 (Tex. App.—Dallas 2005, no pet.) (11 days); *City of Bellaire v. Hennig*, No. 01-21-00077-CV, 2022 WL 210138, at *4 (Tex. App.—Houston [1st Dist.] Jan. 25, 2022, no pet.) (six months).

gap).[6] The defendant's conduct is likewise causally attenuated when intervening events constituted a more direct cause of the plaintiff's injuries. *See IHS Cedars*, 143 S.W.3d at 800 ("Often, … the causal link between conduct and injury will be too remote to be legally significant when two separate and sequential tortious incidents join to lead to the injury.").[7] Such intervening events can include the criminal conduct of third parties.[8]

Texas courts consider these circumstances holistically in making the legal determination of whether the defendant's conduct is so remote that it merely furnished a condition making the plaintiff's harm possible, and thus cannot properly

---

[6] *See also Koehler*, 981 S.W.2d at 34, 36 (off hospital grounds); *Boatman v. City of Garland*, No. 05-13-01232-CV, 2014 WL 2628193, at *2 (Tex. App.—Dallas June 12, 2014, no pet.) (distance between Houston and Garland, Texas); *Cherry*, 978 S.W.2d at 244 (30 miles); *Hawkins*, 169 S.W.3d at 534 (300 miles).

[7] *See, e.g.*, *City of Dallas v. Sanchez*, 494 S.W.3d 722, 726-27 (Tex. 2016) (per curiam) (actions of emergency responders); *Providence Health Ctr.*, 262 S.W.3d at 328 (conduct of patient and family members); *IHS Cedars*, 143 S.W.3d at 797, 800-02 (conduct of speeding driver and circumstances of crash); *Munoz v. City of Pearsall*, 64 S.W.3d 119, 123 (Tex. App.—San Antonio 2001, no pet.) (driver's actions and knowledge).

[8] *See, e.g.*, *Miranda v. TriStar Convenience Stores, Inc.*, No. 01-11-01073-CV, 2013 WL 3968337, at *7 (Tex. App.—Houston [1st Dist.] Aug. 1, 2013, no pet.) (armed robbery/shooting); *Texas Dep't of Mental Health & Mental Retardation v. Lee*, 38 S.W.3d 862, 867-68 (Tex. App.—Fort Worth 2001, pet. denied) (sexual assault); *Ambrosio*, 20 S.W.3d at 266, 268-69 (carjacking/shooting); *Roberts v. Healey*, 991 S.W.2d 873, 879 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (shooting); *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (sexual assault); *Bush v. Texas Dep't of Protective & Regulatory Servs.*, 983 S.W.2d 366, 369 (Tex. App.—Fort Worth 1998, pet. denied) (child abuse/death); *Koehler*, 981 S.W.2d at 34-36 (sexual assault).

be considered the legal cause of that harm. The Texas Supreme Court's decision in *Bossley* is illustrative. There, the court concluded that unlocked doors at a mental health facility that "permitted [a patient's] escape" were "too attenuated" from that patient's subsequent "death to be said to have caused it." 968 S.W.2d at 343. The patient had fled the facility and run a half mile before attempting to hitchhike on a freeway, and finally leapt in front of an oncoming truck as he was about to be apprehended. *Id.* Although the unlocked doors were "part of a sequence of events that ended in [the patient's] suicide," they were too "distant geographically, temporally, and causally" to be considered its cause. *Id.*

    *Bossley* is one of several cases in which Texas courts have found the challenged conduct to be too attenuated from a plaintiff's injuries to satisfy proximate causation, even though the conduct played a role in the causal chain. *See, e.g.*, *IHS Cedars*, 143 S.W.3d at 797, 800-02 (hospital and employees' negligent discharge of patient was too attenuated from patient's injuries sustained in car crash 28 hours later, in which speeding driver suffered psychotic episode and swerved to avoid obstacle in the road); *Hawkins*, 169 S.W.3d at 531, 534 (improper storage of prison guards' weapons, which were then stolen by escaping inmates, was too remote from shooting death caused by inmates 11 days later and 300 miles away); *Ambrosio*, 20 S.W.3d at 266, 268-70 (negligent storage and display of firearms, leading to theft of gun, was too attenuated from murder committed with gun at least two weeks later, miles away, after gun had changed hands).

**b.** These decisions make clear that Air Force agents' conduct in this case is too attenuated from plaintiffs' injuries to be considered their proximate cause. The district court erred as a matter of law in concluding otherwise, but insofar as the holding is deemed to involve a factual determination, that determination was clearly erroneous.

Air Force agents failed to submit Kelley's fingerprints and conviction information as part of their 2011-2012 investigations at Holloman Air Force Base in New Mexico. ROA.19165, 19189, 19219. That failure occurred at a distance of approximately five years and 600 miles from Kelley's 2017 attack on the First Baptist Church. ROA.19165. Indeed, the agents' conduct concluded over three years before Kelley even bought the rifle at issue, ROA.19196, which occurred over a year and a half before Kelley used that rifle to commit mass murder, ROA.19201-02.

The five-year period between the failure to submit Kelley's information to NICS and the shooting saw countless intervening events, including multiple intentional criminal acts by Kelley, that further attenuated the causal chain. The most immediately significant intervening events concerned Kelley's marriage to Danielle Smith. After several moves, Kelley and Smith returned to Texas, where Kelley developed an intense conflict with Smith's family. *See* ROA.19192-93, 19197-98. Kelley's relationship with Smith and her family was particularly strained in the days leading up to the shooting. Smith was to testify against her foster father in a criminal trial for sexual abuse at the end of November 2017. Kelley was opposed to her testifying, ROA.19190-91, 19200-01, and he was disturbed by a police visit on

36

November 1 to retrieve alleged photographs and videos of the abuse. ROA.19199-201, 34073:21-74:6. In the days before the shooting, Smith asked Kelley for a divorce. ROA.19201, 33819:21-20:2.

The district court explained that there was "no way to plausibly explain the attack on the First Baptist Church without reference to Smith and her family." ROA.19247. Smith's family were members of the First Baptist Church of Sutherland Springs. ROA.19191, 19203. "Kelley intended to kill Smith's family *and* isolate her as a part of a pattern of physical, emotional, and verbal domestic abuse." ROA.19247. These factors underscore Kelley's determination to do harm entirely independent from any act by the United States in 2012.

Each of Kelley's firearm purchases after his discharge from the Air Force involved additional criminal acts as he falsely attested that he had not been convicted of a felony or a misdemeanor of domestic violence. ROA.58215. And Academy Sports + Outdoors independently violated federal law when it sold Kelley the Ruger AR-556 that he used in the First Baptist Church shooting. ROA.19257-58. Kelley later committed additional criminal acts, including the purchase of a bulletproof vest over eBay, despite being legally prohibited from possessing body armor. ROA.34026:6-16, 33956:9-13. And the shooting itself—an act that resulted from months of planning and a long chain of intentional acts by Kelley—was not merely illegal, but horrific.

The Air Force agents' failure to transmit information undermined the efficacy of a background-check system that should have prevented Kelley's purchase of the

rifle that Kelley ultimately used to perpetrate the atrocities at the First Baptist Church. But it is not necessary to excuse that failure in order to recognize that the government's actions are not a legal cause of Kelley's murderous assault under Texas law. At a distance of five years, approximately 600 miles, and countless changes in circumstances and criminal acts in between, the government's mistakes cannot be considered the proximate cause of plaintiffs' injuries.

**c.** In a footnote, the district court concluded that the government's conduct was not "too remote in time" from plaintiffs' injuries given the "ongoing nature of the danger created." ROA.19241 n.31; *see* ROA.11647. As an initial matter, the court erred in considering the temporal gap without reference to the myriad intervening events that attenuated the causal chain. When considered altogether, those factors demonstrate that the government's conduct was not a substantial factor in Kelley's murderous attack.

The district court also relied on *Bell v. Campbell*, 434 S.W.2d 117, 120-22 (Tex. 1968), and *Union Pump*, 898 S.W.2d at 776, for the principle that if the effects of the defendant's negligence have not ceased completely, the connection to the plaintiffs' injuries cannot be considered "too attenuated to establish proximate cause." ROA.19241 n.31. But those decisions—both of which found no causation— demonstrate the district court's error. As in those cases, the government's negligence here merely "create[d] the condition that made [plaintiffs'] injuries possible," *Union Pump*, 898 S.W.2d at 776. These cases do not support a supposed rule that all lingering

effects from a negligent act must have dissipated for a defendant to avoid liability; indeed, they hold the opposite. Other Texas cases confirm the district court's error. *See, e.g.*, *Providence Health Ctr.*, 262 S.W.3d at 325-28 (holding "discharge from the ER was simply too remote from [the man's] death in terms of time and circumstances," without suggesting that the negligent discharge had no bearing on the later events); *Sanchez*, 494 S.W.3d at 726-27. To satisfy the substantial-factor test, the challenged conduct must fairly, reasonably, and practically be considered responsible for causing the harm. *Cf. Union Pump*, 898 S.W.2d at 775-76. Texas law precludes that conclusion here.

### 2.     Causation under the emboldenment theory

Similarly, the record provides no basis for establishing liability under the district court's alternative emboldenment theory. The court's causation analysis focused on the theory of liability propounded by plaintiffs—that NICS would have prevented Kelley from obtaining a firearm if his conviction had properly been reported. ROA.19226-34. The district court did not separately consider causation with respect to its alternative emboldenment theory. To do so would have required separate findings that the court's hypothesized psychological effect—the "emboldening"—was a substantial cause of Kelley's decision to perpetrate the mass shooting. Such findings are wholly absent from the court's determination. Indeed, the closest the court came to addressing the issue was a statement (made while addressing an unrelated argument) that "the question of whether a firearm denial would have discouraged

Kelley from committing the shooting is irrelevant." ROA.19233. This statement cannot be squared with a liability finding that rests on the supposition that the United States made Kelley more prone to violence by failing to deny his attempts to purchase firearms illegally.[9]

Even had the court considered causation as to the emboldenment theory, the attack was not the "the natural and probable result" of a failure to demonstrate to Kelley that he was not above the law. *Doe*, 907 S.W.2d at 477 (quotation marks omitted). The attenuation between the conjectured emboldenment and the attack is exemplified by the district court's focus in its emboldenment discussion on Kelley's successful purchase of a weapon in April 2012 that was not used in, and was wholly disconnected from, the November 2017 attack. *See supra* pp. 29-30; *see also* ROA.19223. And, as described previously, "Kelley's mental health was already compromised while he was in the Air Force" and "did not substantially deteriorate after he left the Air Force," ROA.19243, refuting the notion that any subsequent psychological developments (such as emboldenment from his successful firearms

---

[9] In a footnote, the district court noted the existence of "credible evidence" that "Kelley would have been deterred from committing the shooting had he been denied from purchasing a firearm at [a licensed dealer] after failing a NICS background check." ROA.19233 n.26. But that single footnote cannot sustain the court's emboldenment theory. The cited testimony addressed whether if Kelley had been prevented from obtaining a firearm from a licensed dealer, he would have sought a firearm from another source. ROA.34672, 34694. It says nothing at all about whether Kelley's ability to purchase a weapon from a licensed dealer emboldened him, let alone was a psychological cause of his attack.

purchases) caused Kelley to perpetrate the shooting. Accordingly, any psychological impact of Kelley's successful firearms purchases is too insubstantial and attenuated from Kelley's action to have been a proximate cause of the tragedy at the First Baptist Church.

### C. Because there was no proper basis for negligent-undertaking liability, the negligent-supervision claims must be set aside as well

The district court also ruled for plaintiffs on their negligent-supervision claims. ROA.19257. But as the court correctly acknowledged, a prerequisite to imposing liability on that basis was a finding that an "employee committed an actionable tort against the plaintiff." ROA.19252 n.34 (quoting *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 800 & n.2 (Tex. 2010)). Accordingly, because the negligent-undertaking claims cannot be sustained, *see supra* Parts I.A and I.B, the negligent-supervision ruling must be set aside as well.

## II. The Brady Act Precludes The Imposition Of Liability

For the reasons discussed, plaintiffs' claims fail as a matter of Texas law. Liability is independently precluded by a provision of the Brady Act. *See* 18 U.S.C. § 922(t)(6). When Congress established a national background-check system, it also determined that it was important to shield from monetary liability those responsible for providing information to the new system. The Brady Act thus provides that "[n]either a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national

41

instant criminal background check system shall be liable in an action at law for damages" for "failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful." *Id.* In concluding that this provision has no bearing on the liability of the United States, the district court misunderstood both Section 922(t) and concepts of respondeat superior that are central to the FTCA's structure.

**A.** The court considered it determinative that Section 922(t)(6)'s immunity provision expressly refers to federal employees, local employees, and local governments, but not the United States. From this, the court inferred that "Congress *chose* not to extend immunity to the United States." ROA.19206; *see also Sanders v. United States*, 937 F.3d 316, 334 (4th Cir. 2019) (reaching the same result on similar reasoning). The statutory language provides no basis for inferring that Congress meant to suspend the normal operation of the FTCA, under which the United States is liable only to the same extent as the "federal employees" who are expressly immunized. The United States and state governments (which are also not expressly referenced) enjoy sovereign immunity and have chosen to make themselves liable for the acts of their employees only in certain circumstances. Local governments, by contrast, do not enjoy sovereign immunity and can be held directly liable for damages. *See Monell v. Department of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978); *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022). Because local governments can face direct liability, the provision immunizing them serves a function distinct from the provision

immunizing their employees, even though a similar provision is unnecessary for the federal and state governments. The district court was incorrect that allowing the United States to invoke the immunity of its employees "would make redundant the listing of both local governments *and* employees of local governments." ROA.628.

Congress's judgment to preempt liability related to providing information to NICS contrasts with a separate provision of the Brady Act that permits an individual erroneously denied a firearm by NICS to bring suit against the United States "for an order directing that the erroneous information be corrected or that the transfer be approved." 18 U.S.C. § 925A. And while this provision authorizes an award of reasonable attorney's fees, it does not permit money damages. *Id.*

**B.** Because Congress has preempted liability of federal employees, there is no basis for imposing liability on the United States itself. Under the FTCA, the United States waived its sovereign immunity to liability only to the extent that is derivative of the liability of its employees. "All FTCA liability is *respondeat superior* liability." *Johnson*, 47 F.3d at 730. And the FTCA authorizes liability only "to the extent that a private individual or a business entity could be held liable under similar circumstances." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 289 (5th Cir. 2012). Respondeat superior liability could thus be imposed here only if a private Texas employer could be held derivatively liable based on conduct of an employee who was immune from liability. That is not the case.

43

The district court mistakenly concluded that Texas would indeed impose respondeat superior liability on an employer even when federal law precludes imposition of liability on the employees themselves. The district court recognized that Texas employers cannot be sued for the negligence of their employees if employee liability is barred by state law. ROA.19207. And it recognized that the United States may also invoke any state-law defenses available to its employees. ROA.19207. The court determined, however, that as a matter of Texas respondeat superior law, an employee's defense to liability created by a federal law stands on a different footing than a defense created by state law.

That distinction is analytically unsound and there is no basis for concluding that Texas courts would distinguish between federal- and state-law defenses in the manner proposed by the district court. In *Morrone v. Prestonwood Christian Academy*, 215 S.W.3d 575 (Tex. App.—Eastland 2007, pet. denied), for example, the plaintiffs sued a teacher for alleged verbal and emotional abuse and also sued her employer-school on a respondeat superior theory. *Id.* at 578. The defendants urged that liability was barred by a provision of the federal Coverdell Teacher Protection Act, 20 U.S.C. § 6736, which provided that "no teacher in a school shall be liable" in specified circumstances. The court held that the teacher had demonstrated "that she is entitled to the affirmative defense of immunity under the Coverdell Act" and that the immunity "also protects [the employer-school] from the derivative claims filed against it." 215 S.W.3d at 584.

The district court nevertheless declared that *Morrone* had not really applied the Coverdell Act at all. The court cited *Morrone*'s observation in a footnote that "[e]ffective September 1, 2003, [an] immunity provided under [Texas law] was extended to include that afforded under the Paul D. Coverdell Act." 215 S.W.3d at 584 n.2. The district court reasoned that the legislature thus "converted a federal immunity provision into an affirmative defense available under state law," and that the court in *Morrone* was thus "applying *Texas* law, not federal law." ROA.19207-08. Nothing in that opinion, which mentions Texas law only in that footnote, suggests any basis for the district court's reading. If the court in *Morrone* thought it was applying a Texas statute, it presumably would have held that the teacher was entitled to immunity under that statute instead of holding that "that she is entitled to the affirmative defense of immunity under the Coverdell Act[.]" 215 S.W.3d at 584. That the case was decided under federal law may reflect the fact that the new Texas legislation became effective September 1, 2003. The child who was the victim of the alleged abuse had been in the teacher's class "in 2002 and part of 2003." *Id.* at 578. Apparently, therefore, the conduct in question took place before the effective date of the Texas law.

The district court further stated that "[a]bsent evidence of preemption, . . . Texas law confirms the Court's understanding that federal immunities and defenses do not automatically create parallel immunities and defenses under state law." ROA.19209. The only Texas case cited for that undisputed point made the

uncontroversial observation that "federal law does not determine whether an officer's actions are discretionary for purposes of state law." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994). Here, however, the Brady Act has unquestionably precluded the imposition of liability under state law. The district court erred in failing to give effect to that preemption in its respondeat superior analysis.

**C.** The district court also concluded that were the Brady Act applicable, it would not protect persons involved in collecting fingerprints and criminal history, or supervising those that do. ROA.19209-10. But individuals can be "responsible for providing information" to NICS, 18 U.S.C. § 922(t)(6), when they play roles in gathering information or developing procedures for providing information to NICS. The statute shields individuals—including state and local employees—for claims based on a responsibility to provide information to NICS. That, of course, is plaintiffs' theory of liability here—that all of the individuals whose conduct is at issue failed to meet their respective responsibilities to provide information to NICS. The district court's holding cannot be squared with the language or purpose of the statute, which precludes liability here.

## III.    The District Court Erred In Apportioning Liability

The district court erred in holding the United States liable at all. But even if the Court disagrees, the district court independently erred in apportioning a total of 60% of responsibility to government employees and only 40% to Kelley.

Under Texas's Proportionate Responsibility Statute, a trier of fact must "determine the percentage of responsibility" for defendants and responsible third parties "with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought." Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). When the "percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent," that defendant is jointly and severally liable for the full amount of the damages recoverable. *Id.* § 33.013(b). Here, the district court apportioned 60% to the United States—20% to AFOSI agents and SFS personnel (for their own negligence in failing to submit Kelley's information to NICS) and 40% to the leadership of AFOSI Detachment 225 (under a negligent-supervision theory). ROA.19261. The court plainly erred in attributing more fault to the government for Kelley's attack than to Kelley himself. But as an initial matter, the court erred in allocating liability to the United States based on two incompatible theories.

### A.    The district court erred in allocating liability to the United States under two mutually exclusive theories

The district court erred in effectively double-counting the responsibility of the United States by apportioning liability to the United States as if the employees who failed to submit Kelley's information to the FBI and their supervisors separately caused the shooting. Even assuming that government employees contributed to Kelley's ability to carry out the massacre, they did so in a single way: they failed to

submit the record of Kelley's court-martial to NICS. Apportioning separate shares of liability for this single failure based on both the negligence of the line employees and the negligent supervision of those same line employees with regard to the same conduct improperly inflated the share of responsibility attributed to the United States.

Texas courts recognize that an employer who already bears respondeat superior liability based on the actions of its employees should not face additional liability under a duplicative negligent-supervision claim. Under Texas law, unless a plaintiff alleges gross negligence, "any direct liability claim for negligence [*e.g.*, supervisory negligence] and a claim for vicarious liability under a theory of respondeat superior are generally 'mutually exclusive modes of recovery.'" *FTS Int'l Servs., LLC v. Patterson*, No. 12-19-00040-CV, 2020 WL 5047913, at *4 (Tex. App.—Tyler Aug. 26, 2020, pet. denied); *see Fuller v. Werner Enters., Inc.*, No. 3:16-CV-2958-BK, 2018 WL 3548886, at *2 (N.D. Tex. July 24, 2018) (collecting cases).

Relatedly, Texas courts recognize that it is inappropriate to allow the factfinder to apportion an additional share of liability to an employer based on a theory that is dependent upon an employee's tort. *See, e.g.*, *American Honda Motor Co. v. Milburn*, No. 05-19-000850-CV, 2021 WL 5504887, at *16-17 (Tex. App.—Dallas Nov. 24, 2021, pet. filed); *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 656-57 (Tex. App.—Dallas 2002, pet. denied); *Conkle v. Chery*, No. 03-08-00379-CV, 2009 WL 483226, at *4 (Tex. App.—Austin Feb. 25, 2009, no pet.); *Loom Craft Carpet Mills, Inc. v. Gorrell*, 823 S.W.2d 431, 432 (Tex. App.—Texarkana 1992, no pet.). District courts in this

circuit have applied this rule as well. *See Williams v. McCollister*, 671 F. Supp. 2d 884, 892 (S.D. Tex. 2009); *Plascencia v. Hillman*, No. EP-19-CV-40-PRM, 2019 WL 4087439, at *4-6 (W.D. Tex. July 3, 2019). And as the district court recognized, ROA.19252 n.34, negligent supervision is a theory of liability where the employer's negligence is predicated on a negligently supervised employee committing an actionable tort. *See Wansey v. Hole*, 379 S.W.3d 246, 247-48 (Tex. 2012) (per curiam).

That courts decline to apportion liability simultaneously to employees (whose employers will be liable through respondeat superior) and to employers under a theory such as negligent supervision reflects the nature of the allocation under Texas law. Texas courts apportion responsibility for a harm based on the percentage of causation attributed to a particular defendant. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003(a), 33.013(a). Earlier in this case, the district court stated that the purpose of the negligent-supervision claims was "to determine the amount of harm that can be independently attributed to [Air Force] leadership's failure to exercise reasonable care in supervising its agents." ROA.11674-75. But those groups did not *independently* cause the failure to transmit information. The United States is not doubly liable because employees failed to provide information to NICS and because their supervisors might have ensured that the information was in fact transmitted.

Accordingly, the district court erred in declining to dismiss plaintiffs' negligent-supervision claims and then separately apportioning responsibility to both the Air Force leadership and the line agents. Because the negligent-supervision claims should

have been dismissed, the Court should eliminate the 40% share of responsibility
attributed to AFOSI Detachment 225 leadership and allocate responsibility to the
remaining responsible parties (AFOSI agents and SFS personnel at 20% and Kelley at
40%) at the relative proportions determined by the district court. Under this
approach, the AFOSI agents and SFS personnel would be apportioned 33% of
liability, with Kelley apportioned 67%.[10]

### B.    The United States was not more responsible for the attack than Kelley

At the very least, for the reasons discussed in Part I.B, *supra*, the district court
erred in concluding that the government bears a greater share of the liability than the
direct perpetrator of the shooting.

Even if the Air Force agents' conduct is not too remote to preclude the
imposition of liability, that conduct is still significantly attenuated from Kelley's
deliberate acts. *See supra* pp. 36-41. And as the Texas Supreme Court has emphasized
"the proportionate-responsibility statute specifies the apportionment should
ultimately be based on responsibility for the damages suffered," such as personal
injury and death, "rather than for the underlying occurrence that introduced a
sequence of events" resulting in those injuries. *Nabors Well Servs., Ltd. v. Romero*, 456
S.W.3d 553, 562-63 (Tex. 2015). Even if the government's conduct might have

---

[10] *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) (requiring whole numbers
in apportionment).

contributed to the sequence of events resulting in plaintiffs' injuries, it cannot be considered the majority cause of them.

Kelley chose to violate federal law by purchasing an AR-556 rifle and chose to use that rifle to commit one of the most atrocious acts of gun violence in our Nation's history. He intentionally fired 450 shots at the congregation of the First Baptist Church. Kelley deliberately fired along the side of the church at head height, before entering the church and targeting individuals at close range. Shooting men, women (including pregnant women), and children, Kelley deliberately murdered 26 people and wounded 22 others, apparently out of personal malice he felt towards his wife's family. *See* ROA.33996:24-34000:25; ROA.19247. The man who pulled the trigger that day cannot bear less than half of the responsibility for causing the injuries and pain of the victims and their families.

What little explanation the court offered for this apportionment in finding that the United States bore 60% responsibility—and thus joint-and-several liability for the total damages award, ROA.19262—cannot justify this extraordinary conclusion. The only case cited by the district court to anchor its decision in Texas law provides no support for its allocation. In that case, a daycare center was found to be negligent in connection with the intentional abuse of a child by one of the daycare's teachers. *Hyde Park Baptist Church v. Turner*, No. 03-07-00437-CV, 2009 WL 211586, at *3 (Tex. App.—Austin Jan. 30, 2009, pet. denied), *order vacated* (Oct. 22, 2010). The daycare was allocated 80% of the responsibility, with the teacher 20% responsible. *Id.* The court

emphasized that the daycare left the victim of the abuse in the teacher's care after receiving reports of her intentional abuse of the child and that it attempted to conceal the abuse from the child's parents. *Id.* at *7. That a negligent party with direct, sustained interaction with and oversight of an intentional tortfeasor at the time of the tort could be determined to be the majority-responsible party says nothing about the appropriateness of the allocation here.

There is no reason to depart from the commonsensical approach of assigning intentional tortfeasors who directly cause an injury a significantly greater share of responsibility than parties contributing years earlier via negligence. *See, e.g.*, *Tri v. J.T.T.*, 162 S.W.3d 552, 554-56 (Tex. 2005) (in apportioning liability for rape and sexual assault by monk, attributed 85% to rapist and 5% each to operator of temple and two other clergymen); *Café Moda v. Palma*, 272 P.3d 137, 138 (Nev. 2012) (in apportioning liability for a stabbing between patrons at a café, attributed 80% to assailant and 20% to café); *Louviere v. Louviere*, 839 So. 2d 57, 77 (La. Ct. App. 2002) (in reallocating responsibility for crime spree, attributed 85% to criminal actor and 15% to sheriff's office).

\* \* \*

Kelley's attack on a congregation of innocent victims was horrific. The United States is committed to preventing illegal firearms transactions and working to keep guns out of the wrong hands, including through the use of background checks. And the United States sympathizes unreservedly with the victims of Kelley's attack. But

under Texas law, the United States is not legally responsible for the damages caused by that shooting. The judgment below cannot be sustained.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

JAIME ESPARZA
  *United States Attorney*

MARK B. STERN
  *s/ Joshua M. Salzman*
JOSHUA M. SALZMAN
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7258*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4747*
  *Joshua.M.Salzman@usdoj.gov*

January 2023

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Joshua M. Salzman*
Joshua M. Salzman

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,966 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

_s/ Joshua M. Salzman_
Joshua M. Salzman

**ADDENDUM**

# TABLE OF CONTENTS

Brady Act, 18 U.S.C. § 922.................................................................A1

Brady Act, 18 U.S.C. § 925A .............................................................A1

28 U.S.C. § 1346 ................................................................................A2

28 U.S.C. § 2674 ................................................................................A2

Tex. Civ. Prac. & Rem. Code § 33.003 .............................................A3

Tex. Civ. Prac. & Rem. Code § 33.013 .............................................A3

**18 U.S.C. § 922**

**§ 922. Unlawful acts**

* * *

**(t)** * * *

**(6)** Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

* * * *

**18 U.S.C. § 925A**

**§ 925A. Remedy for erroneous denial of firearm**

Any person denied a firearm pursuant to subsection (s) or (t) of section 922--

**(1)** due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or

**(2)** who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922,

may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

## 28 U.S.C. § 1346

### § 1346. United States as defendant

\* \* \*

**(b)(1)** Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

\* \* \* \*

## 28 U.S.C. § 2674

### § 2674. Liability of United States

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

With respect to any claim under this chapter, the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled.

\* \* \* \*

**Tex. Civ. Prac. & Rem. Code § 33.003**

**§ 33.003. Determination of Percentage of Responsibility**

**(a)** The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

> **(1)** each claimant;
>
> **(2)** each defendant;
>
> **(3)** each settling person; and
>
> **(4)** each responsible third party who has been designated under Section 33.004.

**(b)** This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission.

**Tex. Civ. Prac. & Rem. Code § 33.013**

**§ 33.013. Amount of Liability**

**(a)** Except as provided in Subsection (b), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

**(b)** Notwithstanding Subsection (a), each liable defendant is, in addition to the defendant's liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if:

> **(1)** the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent;

* * * *

A3